UNITED STATES DISTRICT COURT   **07 CV 10659**
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STATE-BOSTON RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br><br>vs.<br><br>ERICSSON LM TELEPHONE CO., CARL-HENRIK SVANBERG and KARL-HENRIK SUNDSTROM,<br><br>                Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff, State-Boston Retirement System, individually and on behalf of all other persons and entities similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to itself and its own acts and on information and belief as to all other matters based upon the investigation of Plaintiff's counsel, which included, among other things: 1) a review of regulatory filings and reports issued by Ericsson LM Telephone Co. ("Ericsson" or the "Company"); 2) a review of securities analysts' reports and advisories about the Company;  3) a review of press releases, conference calls and other public statements issued by the Company;  4) a review of media reports about the Company;   and 5) a review of other publicly available information about the Company. Plaintiff believes that substantial additional evidentiary support for the allegations set forth in this Class Action Complaint ("Complaint") will become known after a reasonable opportunity for discovery.

## SUMMARY OF ALLEGATIONS

1.      This is a federal class action on behalf of all persons and entities, other than defendants, who purchased or acquired the securities of Ericsson from February 2, 2007 to November 20, 2007, inclusive (the "Class Period") and who were economically damaged.  The Action seeks remedies under the Securities Exchange Act of 1934, 15 U.S.C.  §§ 78a *et seq*. (the "Exchange Act").  Throughout the Class Period, defendants engaged in a fraudulent scheme and/or published a series of materially false and misleading statements that defendants knew, and/or were severely reckless in not knowing, were materially false and misleading, and failed to disclose material information necessary to render such statements not false and misleading.

2.      Defendant Ericsson is a Sweden-based company that offers a portfolio of telecommunication and data communication systems and services covering a range of technologies.  Ericsson is headquartered in Kista, Sweden, with branch offices in the United States and around the globe.  The Company's American Depositary Shares ("ADSs") are listed on the NASDAQ and its Class A and B shares are listed on the Stockholm Stock Exchange.

3.      Throughout the Class Period, defendants issued statements to the public reassuring the market that demand for the Company's new mobile networking equipment, and demand for upgrades to existing networking equipment, remained strong.  These statements stood in stark contrast to the statements issued by Ericsson's primary competitors, Alcatel-Lucent and Nokia-Siemens, which reported lower demand from its customers across product lines during the same time period.

4.      Defendants' reassurances of continued strong growth in 2007 were materially false and misleading when made because demand for the Company's products was weakening in many markets, particularly in Europe and North America.

5.      On October 16, 2007, before the market opened, Ericsson issued a press release entitled "Lower than Expected Result for Ericsson in Third Quarter 2007."  In this release, the Company attributed lower than previously-forecasted operating income to an "unexpected shift in business mix," away from the high margin network upgrades and toward low margin new network systems.  On November 20, 2007, defendants informed analysts following the Company that it was not simply a "margins" issue and that in fact, <u>overall</u> <u>demand</u> for the Company's products, particularly in Europe and North America, had "tightened" to the point that it expected fourth quarter profits to be at the low end of its forecast a few weeks earlier, and far below what it had consistently led the market to believe would be the case.

6.      As a result, Ericsson's stock price, which reached a Class Period high of $43.41 on July 12, 2007, fell to a three year low of $23.00 per share on November 21, 2007, after defendants belatedly disclosed that demand for its products had fallen.

7.      Defendants' wrongdoing caused Plaintiff and the members of the Class to be harmed economically, and caused the Company's market capitalization to decrease dramatically.

## JURISDICTION AND VENUE

3.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

5.      Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Ericsson has operations in this District and many of the acts and transactions giving rise to the violations of law complained of occurred here.

6.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

7.    Plaintiff State-Boston Retirement System purchased Ericsson publicly traded securities at artificially inflated  prices during the Class Period and was damaged economically by defendants' wrongdoing.

8.    Defendant Ericsson is based in Sweden and provides communications networks, related services, and handset technology platforms for mobile and fixed network operators worldwide.  The Company operates through three segments: Mobile Networks, Fixed Networks, and Professional Services.  The Mobile Networks segment provides mobile systems solutions to network operators, including radio base stations, base station and radio network controllers, mobile switching centers, and application nodes.  It offers mobile telecommunications systems that incorporate 2G (GSM, TDMA, and CDMA), 2.5G (GPR S), and 3G (EDGE, WCDMA, HSPA, CDMA 2000, and TDSCDMA) mobile technology standards.  The Fixed Networks segment supplies broadband communications equipment and services to fixed network operators in Latin America and Europe. The Professional Services segment provides consulting, education, systems integration, and managed services, as well as customer support services to the telecommunication industry. Further, the Company, through its joint venture with Sony Ericsson Mobile Communications AB, offers mobile phones, accessories, and PC cards.

9.    Defendant Carl-Henrik Svanberg ("Svanberg") is, and at all relevant times was, President, Chief Executive Officer ("CEO") and a director of Ericsson.

10.    Defendant Karl-Henrik Sundstrom ("Sundstrom") was, until October 26, 2007, Executive Vice President and Chief Financial Officer ("CFO") of Ericsson.

11.    Defendants Svanberg and Sundstrom are referred to as the "Individual Defendants."

12.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, compensation practices, operations, operational trends, financial statements, markets and present and future business prospects by means of access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto) available to them, and conversations and connections with other corporate officers and employees. With respect to all Individual Defendants, they had access to the adverse undisclosed information about the Company's business, compensation practices, operations, operational trends, financial statements, markets and present and future business prospects through, among other things, their attendance at management and Board meetings and meetings of their respective board committees and through reports and other information provided to them in connection therewith.

13.    Each of the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  The Individual Defendants, because of their positions of control and authority as officers of Ericsson, were involved in drafting, producing, reviewing, approving and/or disseminating communications with the public and the false and misleading statements and information alleged herein, knew, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these

statements, in violation of the federal securities laws. Each had the ability and/or opportunity to prevent the issuance of the misstatements or cause the misstatements to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the misrepresentations contained therein.

14.    Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Ericsson securities and ADSs by disseminating materially false and misleading statements and/or concealing material adverse facts with respect to demand for the Company's networking equipment and the low prices it was forced to charge to increase market share. The scheme: (i) deceived the investing public regarding Ericsson's business, operations, management and the intrinsic value of Ericsson securities and ADSs; and (ii) caused Plaintiff and other members of the Class to purchase Ericsson securities and ADSs at artificially inflated prices.

15.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various statements complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions there from, and were aware of their materially false and misleading nature with respect to the statements concerning stock options challenged herein. Because of their position with the Company each of the Individual Defendants had access to the adverse undisclosed information about Ericsson's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations, made by or about Ericsson and its business, issued or adopted by the Company, materially false and misleading.

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or acquired the securities of Ericsson from February 2, 2007 to November 20, 2007, inclusive, and who were economically damaged thereby.  Excluded from the Class are defendants, the officers and directors of the Company, members of the immediate families of any excluded person, the legal representatives, heirs, successors or assigns of any excluded person, and any entity in which defendants have or had a controlling interest.

17.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ericsson had over 1.5 billion shares of common stock issued and outstanding.  Its ADSs also actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, record owners and other members of the Class may be identified from records maintained by Ericsson or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members were similarly impacted by the wrongful conduct complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether defendants' acts violated the federal securities laws;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Ericsson; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

21.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

27.    The Class Period starts on February 2, 2007.  On that date, the Company issued a press release touting its performance in 2006 and stating that the Company will continue to grow earnings in 2007.  The press release quotes defendant Svanberg stating:

> We have concluded another successful year and see continued opportunities to outpace the market.  We have achieved sales of SEK 178 b., an increase of 17%, while maintaining strong margins. Through our focus on operational excellence, costs continue to grow slower than sales….

> We are well positioned for 2007.   With our leading positions in mobile networks and professional services, substantial investments in next-generation IP networks and multimedia, we have the platform to continue to capture market share and drive the industry forward.

The press release also contained the following "Outlook" section, with a forecast that growth would continue in 2007 at a rate on par with 2006:

> The traffic growth in the world's mobile networks is expected to continue as a result of both new services and new subscribers.

> For 2006 our estimate is that the GSM/WCDMA track within the global mobile systems market, measured in USD, showed mid-single digit growth.
>
> For 2007 we believe that the GSM/WCDMA track within the global mobile systems market, measured in USD, will continue to show mid-single digit growth.

28.    On February 12, 2007, Ericsson participated in the 3GSM World Congress Conference.  As reported by *Bloomberg News*, Ericsson stated at this meeting that it expected to grow at a faster pace than the market in 2007.  Defendant Svanberg stated:

> We outpaced the market quite a lot last year, and we'll outpace the market this year as well.  [In 2006], smaller and weaker players lost sales more than we thought.  Our own role was stable.  We see the same conditions for 2007.

29.    On April 26, 2007, the Company issued a press release titled "Ericsson Reports Robust Start of the Year."  For the first quarter, the Company reported that net income grew 27 percent to Skr 5.8 bn ($861 m) while net sales grew 8 percent and network sales grew 5 percent. Operating margins, excluding Sony Ericsson, reportedly increased to 15.5 %.  In this release, defendant Svanberg stated:

> We have concluded another quarter with solid performance and market share gains in a stable growth environment.  Sales growth in the quarter was primarily driven by Western Europe, and large turnkey projects in Central and Eastern Europe, Middle East, Africa, and Asia Pacific.  Our capability in managing such projects around the world is a competitive advantage.  **Margins remain stable**, due to the benefits of scale and technology leadership.  Our commitment to operational excellence continues and operating expenses grew less than 3 percent versus a sales growth of 8 percent. [emphasis added]…
>
> We are uniquely positioned to benefit from current market conditions.

The press release also contained the following "Outlook" section, with a forecast that growth would continue in 2007 at a rate on par with 2006:

> For 2007 we believe that the GSM/WCDMA track within the global mobile systems market, measured in USD, will continue to show mid-single digit growth.
>
> The addressable market for professional services is expected to show good growth in 2007.
>
> With our technology leadership and global presence we are well positioned to take advantage of these market opportunities.

30.     The next day, on April 27, 2007, *The Financial Times* of London reported on the Company's earnings announcement, and quoted defendant Svanberg as stating, "I don't think we could ask for much more in the period."  The *Times* article  highlighted that Ericsson was alone among its competitors in not cutting its forecast, stating, "[u]nlike Nokia-Siemens and Alcatel-Lucent, Ericsson has maintained its market forecast, predicting continued mid-single-digit annual growth for both the mobile and fixed markets."

31.     On April 20, 2007, Ericsson's competitor, Nokia-Siemens, announced that it had started operations as a combined entity in the communications infrastructure market.  The new company, owned by Nokia and Siemens, is third in size in this market, smaller than Ericsson.  Nokia-Siemens also used the announcement to dampen the market's expectations of the new Company's expected performance in 2007, citing a slow down in spending in some regions by its target customers.  This slow down reported by Nokia-Siemens was not acknowledged by Ericsson until many months later.

32.     Ericsson continued to condition the market to expect Ericsson to outperform its competitors.  On May 9, 2007, Ericsson issued a press release announcing the sale of its millionth GSM base station, stating:

> Since delivering its first base station in 1991 to Mannesmann in Germany, Ericsson rapidly emerged as the market leader in GSM technology.  The growth in demand for GSM services has resulted in

Ericsson delivering the same number of GSM Base Stations during 2004-2007 as during the period 1991-2003.

The cost efficiencies offered by GSM, its broad portfolio of devices, plus its track record of securing migration to 3G systems have helped secure the GSM technology's position in both high-growth and established markets.

**The strong growth is expected to continue.** The number of GSM subscribers around the world is set to increase by 40 million per month during 2007 according to the global trade association GSM Association, GSMA. More than 10 million are currently being added every month across India and China. In India alone, Ericsson is currently installing a new GSM base station every 15 minutes.

Kurt Jofs, Executive Vice President and head of Business Units at Ericsson, says: **"After 16 years, the pace of GSM deployments shows no sign of slowing down. In fact, we expect 2007 to be the fifth consecutive record year for deliveries.** Ericsson is committed to delivering quality communications for all. We will continue to leverage on our expertise in evolving mobile infrastructure to provide future-proof investment in Ericsson GSM networks." [emphasis added].

33.     On the same day, Ericsson issued another press release entitled "Ericsson's CEO Shows Confidence in the Future – Continued Growth with Good Profitability." The press release highlighted the Company's supposed competitive advantages:

**Today, at Ericsson's Capital Markets Day in Stockholm, President and Chief Executive Officer, Carl-Henric Svanberg highlighted Ericsson's strong competitive position in a new era of global communication.** [emphasis in original]

"Our way of communicating is changing rapidly with the rollout of mobile and fixed high-speed broadband," said Svanberg. "As a result, we expect traffic in fixed as well as mobile networks to grow tenfold by 2012. With high-speed broadband, we will see multimedia to start a new era in telecom.

34.     On July 20, 2007, the Company issued a press release announcing its second quarter earnings. The Company announced a 12% increase in net income on an 8% increase in sales.

Operating margins reportedly increased 1% to 19.4%. The release was titled "Ericsson Reports Continued Solid Performance." In the release, defendant Svanberg stated:

> We continue to outpace the market. Sales showed an encouraging year-over-year increase this quarter, primarily driven by Asia Pacific. Europe, Middle East and Africa were softer while we see improving trends in the Americas. Margins were stable with improved cash generation.

> Once again, the Company issued a bullish assessment of its outlook:

> For 2007 we continue to believe that he GSM/WCDMA track within the global mobile systems market, measured in USD, will continue to show mid-single digit growth.

> We also continue to believe that the addressable market for professional services is expected to show good growth in 2007.

> With our technology leadership and global presence we are well positioned to take advantage of these market opportunities.

35.    On September 11, 2007, Ericsson hosted a Strategy and Technology Summit Conference in London. On the day of the Summit Conference, *Bloomberg* reported:

> Ericsson AB, the world's largest maker of wireless network equipment, climbed the most in more than a year in Stockholm trading after predicting "strong" industry growth in the third quarter as data traffic increases.
> Ericsson shares rose 5.4 percent. The company said its main network market will grow about 5 percent in 2007, reiterating an earlier target. "We have good reason over time to reach our old levels," Chief Executive Officer Carl-Henric Svanberg said at an event for investors in London today. ``We expect to continue to do well in all our areas.''
> Demand for networks that let users download music, view street maps on handheld devices or share files is "beyond any expectation," Svanberg said. Stockholm-based Ericsson is upgrading networks for more than 50 phone companies, with about 6 million customers signing up for faster mobile access each month globally, Ericsson said in documents distributed today. Ericsson said mobile subscribers globally will exceed 5 billion by 2012.

* * *

Ericsson shares rose 1.32 kronor to 25.80 kronor in Stockholm, the biggest gain since July 2006. Before today, the stock was up 2.4 percent in a year, trailing the 15 percent increase in Sweden's OMX Index.

Multimedia Push

The Swedish company has sought to capitalize on rising demand for wireless media applications by creating a multimedia division, partly with the help of acquisitions including Tandberg Television ASA. The performance of the multimedia division will remain ``bumpy'' because the unit is still in a start-up phase, Svanberg said, reiterating comments made in July.

"We all can see that mobile broadband will be a mass market," Svanberg said. "Data will take over."

38.    With this news, Ericsson's stock price increased to above $38 per share on September 11, 2007, and continued to increase. On September 12, 2007, Ericsson's stock had increased above $39 per share. Between February 2, 2007 and September 12, 2007, Ericsson's NASDAQ-traded ADSs rose 9.3%, while Alcatel-Lucent's shares declined almost 20% during the same period. Nokia-Siemens is not an independent company.

39.    On September 13, 2007, only two days after Ericsson issued a press release touting the strength of the market, the Company's competitor, Alcatel-Lucent, issued a statement lowering its full year revenue outlook for 2007, from revenue growth in the mid-single digits to "flat to slightly up." Explaining the reason for this downward revision, the release stated:

This downward revision in the revenue forecast is based on the most recent and updated discussions with some wireless customers in North America. Alcatel-Lucent is now seeing a change in capital spending with those customers in 2007, compared to what it had anticipated. As a result, the company is not seeing the projected volume changes that would have mitigated the ongoing pricing pressures it is experiencing. In other regions and businesses, in particular wireline, enterprise and Asia-Pacific, revenue performance continues to be strong.

40.    Ericsson and Svanberg continued to tout the Company's outlook, in particular the Company's opportunities in North America, well into late September.  On September 28, 2007, Svanberg was interviewed in New York, and as reported by *Bloomberg*:

> Ericsson AB Chief Executive Officer Carl-Henric Svanberg may seek to revive declining sales in North America by selling more network equipment to Google Inc. and customers other than AT&T Inc. and Verizon Wireless.
>
> Years from now, there will be "little difference" between the communications equipment that Google and more traditional phone service providers buy as technologies "converge," Svanberg, 55, said in an interview today in New York.
>
> In addition to competing with mobile-phone rivals Nortel Networks Corp. and Alcatel-Lucent, Stockholm-based Ericsson is challenging Cisco Systems Inc. and Juniper Networks Inc. in the Internet-equipment business as more consumers use computers and mobile devices to download music, watch video clips, view maps and share files.
>
> "Traditional operators will always be a major part of our business," Svanberg said. "In the multimedia world that arises, there will be other customers as well. It could be the cable guys; it could be Google."
>
> * * *
>
> North American Gains
>
> Svanberg, who has run Ericsson since 2003, said the company may also see gains in North America as its rivals combine or cut jobs to revive profits.
>
> * * *
>
> "One of the openings we have in North America is to actually become the second vendor," Svanberg said.  "We can be the main alternative.  That was tougher before."
>
> Buying Companies
>
> Ericsson has sought to bolster its position in the U.S. by buying companies such as Redback Networks Inc. and Entrisphere Inc. to add broadband access technology.  It also agreed to buy Tandberg Television ASA to acquire videocompression equipment that allows

the transmission of data that would otherwise be too much for networks to transfer.

Svanberg said Ericsson is relying on technologies other than WiMax, a standard touted by Nortel, Intel Corp. and Motorola Inc. for speedier wireless Internet access.  Sprint-Nextel Corp., the third-largest U.S. wireless carrier, plans to spend as much as $5 billion on a WiMax network by 2010.

"It's hard to see that it would suddenly start to become a major technology," Svanberg said.  "If it did for some reason that we can't really see, then we'd be there as well."

Svanberg said he expects "strong" increases in data traffic to fuel demand.   The company's 2007 industry forecast of "mid-single-digit" growth has been unchanged since February, when Ericsson cut its prediction from 5 percent to 10 percent.

41.    On October 5, 2007, the *Financial Times* also reported that Alcatel-Lucent, one of Ericsson's main competitors, issued three profit warnings since December, 2006.  During the same period, Ericsson touted expected growth in revenue and earnings and strong demand for its products.

42.    Defendants' reassurances of continued strong growth in 2007, and their specific assurances that Ericsson was performing better than its competition, were materially false and misleading when made because demand for the Company's products was weakening in many markets, particularly in Europe and North America.

43.    On October 16, 2007, before the market opened, Ericsson surprised the market by issuing a press release entitled "Lower than Expected Result for Ericsson in Third Quarter 2007." The release stated in part:

Ericsson expects sales of SEK 43.5 b., an operating income of SEK 5.6 b. and a cash flow of SEK -1.6 b. for the third quarter 2007.  This is below the company's own as well as current market expectations and primarily a result of an unexpected shift in the business mix. "The unexpected development in the quarter is mainly due to a shortfall in sales in mobile network upgrades and expansions which resulted in an unfavorable business mix that also negatively affected

Group margins," said Carl-Henric Svanberg, President and CEO of Ericsson. "All other businesses performed as expected. The effect of market dynamics is always a matter of judgment. This quarter we have underestimated the effects."

Ericsson's networks business continues to develop most rapidly in regions where new network rollouts and break-in contracts are predominant. This is where competition is intense as it builds footprint for long-term profitable growth. So far the margin pressures from these business activities have been offset by higher margin sales such as network expansions and upgrades. Such expansions and upgrades have a short sales cycle and builds during the quarter. This quarter, sales of these higher margin offerings did not materialize as much as in previous quarters. High margin software sales are also lower than normal.

The Professional Services segment continues to show strong growth and stable margins. The Multimedia segment is expected to also show a strong growth with operating income slightly above breakeven level, reflecting the continued investments in new business areas.

"In infrastructure scale is critical for success. Our strategy to regain scale advantage through increased mobile systems market shares has been effective. The present market dynamics are however working to our disadvantage from a short-term financial perspective. Now that we have reestablished our scale advantage from the pre-industry consolidation we will shift our focus slightly and capitalize on our market share gains," said Carl-Henric Svanberg

* * *

The year-over-year sales increase of 6% consisted of organic growth of 4%. The USD has continued to weaken during the quarter and affected reported sales growth negatively.

The decline in gross margin is mainly due to an unfavorable business mix consisting of a high proportion of new network rollouts and lower software sales. In addition to the good growth in network rollout, sales of transmission systems, with a lower margin, showed strong growth, also negatively affecting Group gross margins. Operating income amounted to SEK 5.6 (8.8) b. in the quarter and SEK 23.0 (23.6) b. year-to-date. In the Networks business mix, new network rollouts are now dominating and in combination with lower sales of software this caused the group operating margins to decline significantly during the quarter. Sony Ericsson's pretax profit contributed 4% to Group operating margin in the quarter. Cash flow

from operating activities is estimated to be SEK -1.6 (4.8) b. in the quarter and SEK 7.2 (7.5) b. year-to-date.

* * *

Networks

Sales in Networks declined mainly due to lower sales of expansions and upgrades of mobile networks with its related high software content. Sales of lower margin network rollouts and break-ins currently represent the majority of the networks business. It is this shift in business mix that is negatively affecting group margins rather than a change in the underlying margins.

* * *

North American sales increased slightly year-over-year, however Ericsson had expected a more significant increase driven by mobile network expansions and upgrades of the installed base which so far has not materialized. In Western Europe Ericsson was also expecting similar sales which did not occur due to ongoing operator consolidation in several major markets.

Sales development in Asia-Pacific was flattish due to lower mobile systems sales in China. The underlying business activity is ongoing at a healthy level but invoicing varies quarter by quarter due to the nature of the Chinese market. Sales in Australia were down as a result of the completion of the initial HSPA network rollout. Excluding China and Australia sales growth was 17% in the region. All other regions developed as expected.

Planning Assumptions

**For the fourth quarter of 2007 our planning assumption is Group sales of SEK 53-60 b. and operating margins in the mid-teens, including Sony Ericsson.**

For the market in 2008, our early expectation is that the current conditions will prevail. [emphasis added]

44. By the close of the market on October 16, 2007, Ericsson's ADSs fell 24%, to close at $31.33 per share, on unusually high volume of 42.7 million shares. The full truth concerning the weakness in the Company's business, however, continued to remain undisclosed until at least November 20, 2007, as discussed below.

45.     On October 17, 2007, the *Financial Times* of London reported that Ericsson expected its third quarter earnings to come up short because of lower margins that resulted from slower sales of network upgrades and higher sales of new equipment in comparison.

> It is an odd fact that, just as there is a bit of conviction that 3G services might be taking off, the companies that build and supply mobile networks are in meltdown. The recently merged Alcatel-Lucent has become a case study in why two plus two can equal three. Nokia-Siemens downgraded its margin targets last quarter and reported a loss. Now Ericsson, the bellwether of the industry, has reported its worst gross margin in 17 quarters.

> \* \* \*

> Weak deal execution has been a big problem for Alcatel-Lucent. If Nokia-Siemens were not overshadowed by Nokia's handset division, it too might have faced flak. Even Ericsson looks less adroit now, having recently reassured investors about its outlook.

> But execution is not a permanent factor. Neither is the main issue hurting Ericsson: deferral of network upgrades in the US, Italy and the UK, as operators ponder network sharing.

49.     It did not take long for analysts, who had been assured throughout the Class Period that demand for Ericsson's products and services remained strong, to take issue with the credibility of Ericsson's management and the quality of the Company's internal controls. In an October 18, 2007, *Associated Press* article, quoting an article in a Swedish newspaper, it was reported that Ericsson's board was informed of the cut in its outlook days or weeks before the Company issued its first warning on October 16, 2007.

50.     On October 25, 2007, Ericsson issued two press releases before the opening of trading. One press release announced the departure of Chief Financial Officer Sundstrom. The other confirmed the previously announced earnings shortfall for the quarter ending September 30, 2007. Like its press release on October 16, 2007, the Company attributed declining profitability to the slow down in sales of network upgrades and expansions. But in this press release, the Company also

acknowledged that for the nine months ending September 30, 2007, sales in North America were off 24%, were flat in Latin America, up only 4% in Western Europe, but had jumped 21% in the Asia Pacific region and were also up in Central and Eastern Europe, the Middle East and Africa, where sales of low margin new equipment and networks predominated.   The Company continued to forecast earnings for the fourth quarter of between SEK 53-60 bn.

51.    On October 26, 2007, *The Financial Times* of London reported that Ericsson's profit warning one week earlier cost Defendant Sundstrom his job.   The *Times* pointed out that the personnel move followed Ericsson's downward revision to its third-quarter earnings forecast that "**wiped out a quarter of its market value in one day – the worst share price collapse in the company's history**."  (Emphasis added).  According to the *Times*, the Company's main shareholders accepted the Company's explanation for the drop in earnings, but "lambasted its inability to spot there was trouble on the horizon and communicate it to the market."

52.    On November 20, 2007, the other shoe dropped.   Instead of continuing to cite the adverse balance of sales skewing from high-margin products to lower-margin network sales and build-outs, the Company finally acknowledged that lower customer demand more generally had caused the disappointing earnings outlook.  *Bloomberg* reported that Ericsson now expected fourth quarter sales to be at the *lower end* of October's stunning forecast [SEK 53-60 bn.], citing a slump in orders in Europe and North America.   The Company finally conceded what its competitors were saying throughout the Class Period, that markets in the United States and Europe were "tightening." "This makes it obvious that something must be wrong in their reporting systems, but it's also obvious that the market is weaker that it has been, said Greger Johansson, an analyst at Redeye AB. "I don't have much confidence in the company or management."

53.    In response, the price of Ericsson securities dropped.  For example, ADSs fell from $28.53 per share on November 19, 2007, to $25.11 per share, a one-day decline of 12%, on unusually heavy volume of 24 million shares.

54.    On November 21, 2007, *The Wall Street Journal* also reported that Ericsson now expected sales for the quarter ending December 31, 2007 to be between 53 billion Swedish kronor and 60 billion, and for lower sales to continue into 2008.

> Late last month, Ericsson issued a profit warning, citing a slackening in demand in wireless networking equipment, similar to many of its peers.  Prior to the warning, Ericsson had been widely believed not to be suffering from these issues.
>
> Ericsson had said the root of the problem was higher sales in less-profitable new network rollouts and lower sales of lucrative software.
>
> A week after the warning, Ericsson reported a sharp fall in its third-quarter net profit, and said it had appointed a new chief financial officer.
>
> The company yesterday said it continues to see problems in its network business, with the European and U.S. markets tightening.

55.    As a result of defendants' false statements, Ericsson securities traded at inflated levels during the Class Period.  However, after the above revelations seeped into the market, the price of Ericsson securities dropped materially. For example, the Company's shares declined more than 46% from their Class Period high.

56.    In fact, throughout the Class Period, defendants had good visibility into the tightening demand for its products as reported by its competitors.  According to Richard Windsor, a telecom equipment analyst at Nomura, management credibility at Ericsson had been "somewhat shattered." "The management stood up in from of the market and said everything is OK, which means they did not know that this had been going on. . . . This calls into question if they are able to financially control their company," he said.  As the Swedish newspaper Svenska

Dagbladet would note, Company's management and the board did know about the shortfall before it was announced.

## LOSS CAUSATION

57.    As detailed herein, throughout the Class Period, defendants engaged in a scheme to deceive the market and engaged in a course of conduct that artificially inflated the price of Ericsson securities.

58.    As a result, Plaintiff and the Class purchased Ericsson securities at artificially inflated prices and were damaged economically when the price of Ericsson securities dropped upon disclosure of the scheme.

## ADDITIONAL SCIENTER ALLEGATIONS

59.    Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the truth regarding Ericsson, their control over, and/or receipt and/or modification of Ericsson's allegedly false and materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company.

60.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing

fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including defendants.

61.     Defendants were personally motivated to commit the wrongdoing alleged herein because they benefited personally from it.

### APPLICABILITY OF PRESUMPTION OF RELIANCE FOR DEFENDANTS' OMISSIONS OF MATERIAL FACTS UNDER THE AFFILIATED *UTE* DOCTRINE, AND/OR, IN THE ALTERNATIVE, UNDER THE FRAUD ON THE MARKET DOCTRINE

62.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972) because the claims asserted herein against defendants are primarily predicated upon the omission of material facts that defendants had a duty to disclose (namely, the existence of the backdating scheme and concealment of the Company's true method for granting and accounting for options).

63.      In the alternative, Plaintiff and the Class are entitled to a presumption of reliance under the fraud on the market doctrine as established below.

64.     At all relevant times, the market for Ericsson's securities was an efficient market for the following reasons.

65.     Ericsson's common shares are traded on the Stockholm Stock Exchange, with average daily volume exceeding 100 million Class B shares per day.  Its shares are also traded on the London Stock Exchange.

66.     Ericsson's ADSs are listed and actively traded on the NASDAQ, a highly efficient and automated market.

67.     Ericsson regularly communicated with public investors through established market communication mechanisms, including through regular disseminations of press releases

on the national circuits of major newswire services and through other wide-ranging public

disclosures, such as communications with the financial press and other similar reporting services;

and

68.     Ericsson was followed by numerous securities analysts employed by major

brokerage firms who wrote reports that were distributed to the public and certain customers of

their respective brokerage firms. Each of these reports was publicly available and entered the

public marketplace.

69.     As a result of the foregoing, the market for Ericsson's securities promptly

digested current information regarding Ericsson from all publicly available sources and reflected

such information in Ericsson's stock price. Under these circumstances, all purchasers of Ericsson

securities during the Class Period suffered similar injury through their purchase of Ericsson's

securities at artificially inflated prices and a presumption of reliance applies.

<strong><u>NO SAFE HARBOR</u></strong>

70.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements was made, the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Ericsson who knew that those statements were false when made.

## COUNT I

### Violation of Section 10(b) of the
### Exchange Act and Rule 10b-5(a),(b) and (c)
### Against All Defendants

71.    Plaintiff, on behalf of all members of the Class individually, repeats and re-alleges each allegation contained above as if fully set forth herein.

72.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Ericsson securities; and (iii) cause Plaintiff other members of the Class to purchase Ericsson securities at artificially inflated prices.

73.    In furtherance of this unlawful scheme, plan and course of conduct, defendants jointly and individually, took the actions set forth herein. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Ericsson's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

74.    Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

24

continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Ericsson as specified herein.

75.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Ericsson's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Ericsson and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Ericsson securities during the Class Period.

76.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Ericsson's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' misstatements of the Company's business, compensation practices, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

77.     As a result of the dissemination of the materially false and misleading information
and failure to disclose material facts, as set forth above, the market price of Ericsson's securities
was artificially inflated during the Class Period. In ignorance of the fact that market prices of
Ericsson's securities were artificially inflated, and relying directly or indirectly on the false and
misleading statements made by these defendants, or upon the integrity of the market in which
Ericsson's securities trades, and/or on the absence of material adverse information that was
known to or recklessly disregarded by these defendants but not disclosed in public statements by
these defendants during the Class Period, Plaintiff and the other members of the Class acquired
Ericsson's securities during the Class Period at artificially high prices and were damaged
thereby.

78.     At the time of said misrepresentations and omissions, Plaintiff and other members
of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff, the other
members of the Class, and the marketplace known the truth regarding declining demand for
Ericsson's products and services, which were not disclosed by defendants, plaintiff and other
members of the Class would not have purchased or otherwise acquired their Ericsson securities,
or, if they had acquired such securities during the Class Period, they would not have done so at
the artificially inflated prices which they paid and would not have suffered economic harm.

79.     By virtue of the foregoing, defendants have violated Section 10(b) of the
Exchange Act, and Rule 10b-5 promulgated thereunder.

80.     Defendants' fraudulent acts artificially inflated the price of Ericsson's securities.
As a result, Plaintiff and the Class purchased Ericsson securities at artificially inflated prices and
were damaged thereby.

81.     As a direct and proximate result of the wrongful conduct of defendants, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

82.     Plaintiff, on behalf of all members of the Class individually, repeats and re-alleges each allegation contained above as if fully set forth herein.

83.     The Individual Defendants acted as controlling persons of Ericsson within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their ownership and contractual rights, substantial participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

84.     As set forth above, defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the

Class suffered damages in connection with their transactions of the Company's securities during the Class Period.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  November 28, 2007

Respectfully submitted,

**LABATON SUCHAROW LLP**

By: _____
Christopher J. Keller (CK-2347)
Eric J. Belfi (EB-8895)
Andrei V. Rado (AR-3724)
Alan I. Ellman (AE-7347)
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477
Attorneys for Plaintiff

**Exhibit A**

## CERTIFICATION

I, Robert E. Tierney, as Executive Officer of Boston Retirement Board, hereby certify as follows:

1.     I am fully authorized to enter into and execute this Certification on behalf of the State-Boston Retirement System ("Boston"). I have reviewed a complaint prepared against Ericsson LM Telephone Co. ("Ericsson") alleging violations of the federal securities laws;

2.     Boston did not purchase securities of Ericsson at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.     Boston is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.     Boston's transactions in the securities of Ericsson as reflected in Exhibit A, are attached hereto;

5.     Boston has not sought to serve as a lead plaintiff in a class action under the federal securities laws during the last three years, except for the following:

> *In Re Amkor Technology, Inc. Securities Litigation* (**appointed**)
> *Garber v. Juniper Networks, Inc. (withdrew)*
> *In re SafeNet, Inc. Securities Litigation* (**appointed**)
> *In re Take-Two Interactive Software Securities Litigation (Class Representative)*
> *Ellen Rosenthal Brodsky v. Yahoo! Inc. et al, (not appointed)*
> *In re Luminent Mortgage Capital, Inc., Securities Litigation (pending)*
> *Briarwood Investments, Inc. v. Care Investment Trust, Inc. (pending)*

6.     Beyond its pro rata share of any recovery, Boston will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this __27__ day of November, 2007.

Robert E. Tierney
*Executive Officer of Boston Retirement Board*

## EXHIBIT A

## TRANSACTIONS IN
## ERICSSON LM TELEPHONE CO.

**ERICSSON(LM) TEL**

| Transaction Type | Trade Date | Settle Date | Shares | Base Price Per Share | Base Cost/ Proceeds |
|---|---|---|---|---|---|
| Purchase | 02/14/07 | 02/19/07 | 45,661.00 | $ 3.67 | ($167,784.14) |
| Purchase | 02/27/07 | 03/02/07 | 82,300.00 | $ 3.63 | ($299,649.91) |
| Purchase | 02/28/07 | 03/05/07 | 21,200.00 | $ 3.58 | ($75,951.80) |
| Purchase | 03/01/07 | 03/06/07 | 76,000.00 | $ 3.50 | ($266,903.47) |
| Purchase | 03/07/07 | 03/12/07 | 55,000.00 | $ 3.42 | ($188,526.59) |
| Sale | 05/11/07 | 05/16/07 | -23,040.00 | $ 3.74 | $85,883.73 |
| Purchase | 05/16/07 | 05/22/07 | 43,100.00 | $ 3.81 | ($164,447.47) |
| Purchase | 05/18/07 | 05/23/07 | 300.00 | $ 3.81 | ($1,144.05) |
| Purchase | 05/22/07 | 05/25/07 | 32,600.00 | $ 3.81 | ($124,465.30) |
| Purchase | 05/31/07 | 06/05/07 | 97,000.00 | $ 3.80 | ($369,604.36) |
| Purchase | 06/04/07 | 06/08/07 | 38,000.00 | $ 3.81 | ($145,046.26) |
| Sale | 06/07/07 | 06/12/07 | -263,083.00 | $ 3.75 | $987,089.14 |
| Purchase | 06/07/07 | 06/12/07 | 38,000.00 | $ 3.79 | ($144,172.55) |
| Purchase | 06/14/07 | 06/19/07 | 77,000.00 | $ 3.71 | ($286,544.60) |
| Purchase | 07/25/07 | 07/30/07 | 62,000.00 | $ 3.84 | ($238,551.50) |
| Purchase | 10/25/07 | 10/30/07 | 262,000.00 | $ 2.94 | ($770,601.30) |

**ADR ERICSSON L M TEL CO**

| Transaction Type | Trade Date | Settle Date | Shares | Base Price Per Share | Base Cost/ Proceeds |
|---|---|---|---|---|---|
| Purchase | 02/27/07 | 03/02/07 | 7,090.00 | $ 35.74 | ($253,488.77) |